(C. D. 192)

Louis Stern Sons, Inc. *v.* United States

## United States Customs Court, First Division

(Decided July 21, 1939)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Marcus Higginbotham, Jr.*, special attorney), for the defendant.

Before McCLELLAND, SULLIVAN, and BROWN, Judges; McCLELLAND, P. J., dissenting

SULLIVAN, Judge: The question in this case is whether certain merchandise described on the invoice as inedible tallow is dutiable, as assessed by the collector, at 20 per centum ad valorem under paragraph 52 of the Tariff Act of 1930, as animal fats not specially provided for, or, as claimed by the plaintiff corporation in its protest, at one-half of 1 cent per pound under paragraph 701 as tallow.

At the outset, of course, the presumption arising from the action of the collector is that this merchandise is classifiable as animal fats not specially provided for. This, however, is a mere presumption, and "cannot be regarded as having evidentiary value and cannot be weighed against the evidence produced on the trial." (*Marshall Field & Co.* v. *United States*, 20 C. C. P. A. 225, 228, T. D. 46037, and cases cited therein.)

At the trial, to overcome this presumption the plaintiff introduced the testimony of a chemist, David Bernard Moss, associated with the plaintiff corporation. He testified he saw this shipment, which consisted of nine drums, when it arrived; that he personally drew therefrom what he termed "a 100% sample," or "a sample of each and every package in the shipment." He described his method of sampling this merchandise as follows:

I used the official method as adopted by the trade, a trier that goes down to the bottom of the drum, and takes a representative sample of the drum.

Q. And did you take a representative sample out of each drum?—A. Absolutely.

Q. And did you combine them into one sample?—A. Yes, sir.

The sample taken by the witness was introduced in evidence as Exhibit 1.

The witness testified he analyzed the sample, Exhibit 1, to determine what the merchandise was, as follows:

The basis of this whole case rests on what they call the titre test. That is the hardness of the tallow, roughly speaking; and what I did was to saponify this tallow with a glyceryl hydroxide solution, and acidify it to get the fatty acid. Now, the titre test is run on these fatty acids. It is run in the following way: The fatty acids are heated up to about 115 degrees Centigrade. When the temperature drops around 70 degrees it is placed in a titre tube, a special tube

for the process. The tube is placed in a bottle, Mason jar, and the whole apparatus is placed in a water bath at 20 degrees Centigrade. A special titre thermometer is used, and when the temperature drops around 50 degrees Centigrade stirring is begun. * * * The rate of stirring is 100 revolutions per minute. * * * A point is reached where the temperature no longer drops. That is held for 30 seconds, and then stirring is stopped. The temperature now begins to rise, usually about 3/10 or 4/10 degree. It varies with the tallow. That point is called the titre point. That is the indication of the hardness of the tallow.

He further testified that the object of this analysis was to determine the titre test, and that he found the measurement of the titre in this case to be "41.05 degrees Centigrade."

He was then asked the dividing line between fats and tallow, and answered:

I would say about 40 degrees Centigrade is a tallow; below 40 degrees Centigrade is the fats.

On cross-examination he testified that out of the nine drums in question, weighing 400 pounds each, he took from each drum "one trier full at a time," which held "around two or three ounces"; that these samples were combined, mixed well, and a sample taken from the mixture, which was tested.

In response to the court he stated the reason for mixing the samples as follows:

You see, this tallow is usually, it runs certain grades. To get the proper result you have to get a 100% sample, of each drum. * * *

To support the collector's classification Mr. Charles E. Augner was called by the Government. He testified:

I am employed as a chemist by the United States Customs laboratory, located at 201 Varick Street.

that he made an analysis of this merchandise, and "found this to be an inedible animal grease" by the titre test; that his "titre value, however, was not above the 40 mark. My titre value was 38.45 degrees Centigrade."

On cross-examination he testified he made this test personally in the laboratory at 201 Varick Street; that he received the sample he analyzed from the receiving department "under a definite C number. That C number was 9983"; that he did not know what portion of the merchandise the sample represents, nor did he know the method of sampling, or how the sample was drawn, whether from the top or bottom of the drums, or whether the sample was taken from every drum. His testimony then continued as follows:

X Q. Now, Mr. Augner, would, in your opinion, the same titre measurement result from a sample drawn from the top of a drum as from the bottom of a drum?—A. No, not necessarily, because it doesn't represent an average sample. In order to get a definite titre value like that it must be representative, throughout the sample.

X Q. So that if the sample that you analyzed was not representative of the entire drum it isn't an accurate sample for the purpose of determining the titre test?—A. That is right.

The foregoing is the gist of the testimony taken at the trial.

In our opinion at the close of plaintiff's testimony the presumption of correctness attaching to the action of the collector ceased to exist, for, as stated in the *Marshall Field* case, *supra*, it "cannot be weighed against the evidence produced at the trial." Government witness Augner did not know the source of the sample he analyzed, whether it was drawn from one drum or the entire nine, or whether it was drawn from the top or bottom of a drum. Mr. Moss, on the contrary, knew the source of the sample he analyzed, for he drew it himself, and it contained a specimen from each drum. His testimony in our opinion overwhelms that of the Government.

It would seem the Government's contention is that the presumption of correctness attaching to the action of the public officer, who took the sample analyzed by the Government chemist, has not been overcome by the plaintiff, or, in other words, that the Government official who took the sample analyzed by the Government's witness presumably did so in a correct and proper manner, and that it was therefore a true and accurate sample of the nine drums of tallow in question. This does not necessarily follow. Granting that the Government officer, who obtained the sample, performed his duty, yet it is evident from the testimony of the Government's witness that if the sample were selected from either the top or the bottom of a drum the same titre measurement would not result. Therefore, proof of the proper selection of the Government's sample becomes important, and the Government did not introduce such proof. In addition, the testimony of plaintiff's witness establishes that Exhibit 1 was taken from all the drums according to the official method as adopted by the trade, and that he analyzed it for the purposes of plaintiff's trade, for plaintiff's use, and for the purpose of checking up on plaintiff's purchases, in order to determine just what the merchandise was. It was therefore taken by plaintiff's witness himself in the regular customary manner in the course of plaintiff's business. We are without any proof that the sample taken by the Government was drawn from the nine drums in this importation in the regular, proper, and official manner, or that it was a fair sample of this merchandise.

It seems to us in the light of these facts that the presumption of correctness attaching to the action of the public officer has been overcome by plaintiff; and on this record it appears to the court beyond a reasonable doubt that the sample taken by the plaintiff was accurate and proper, while, on the contrary, we are without proof that Government's sample was properly drawn, and as representative of the im-

portation as that taken by plaintiff. The Government could very well have introduced proof that its sample was accurately and properly drawn in accordance with the regulations, if such were true.

While the question is a sharp one we think that the weight of the evidence supports plaintiff's contention.

It is not necessary to cite further authorities than the *Field* case, *supra*, as to the weight to be given to presumptions. Presumptions are created for the specific purpose of satisfying the judicial mind where the evidence introduced by both parties is evenly balanced. Then the presumption of correctness attaching to the action of public officers has some weight. That is not true in the case at bar where the facts are not at an equilibrium.

We therefore hold that the merchandise in question is dutiable, as claimed, at one-half of 1 cent per pound under paragraph 701 as tallow, and reverse the action of the collector.

The protest is sustained. Judgment for the plaintiff.

DISSENTING OPINION

McCLELLAND, Presiding Judge: I regret that I am unable to concur in either the views expressed by my colleagues or the conclusion reached by them. The record shows that two witnesses were called to testify on the trial of the issue, one for the plaintiff and one for the Government. David B. Moss, called as a witness on behalf of the plaintiff, stated that he was in the employ of the plaintiff company as a chemist; that "all the material that comes in, and all the material that goes out" were tested by him; that with the use of an implement known as a trier he took a representative sample from each of the nine drums involved in the shipment; that the nine samples were combined into one composite sample and that he subjected such sample to the titre test to determine its hardness. After detailing the method of making the test he stated that he found the titre point of the sample to be 41.05 degrees centigrade. He also stated that the foregoing method of obtaining a sample was the "official method adopted by the trade," and that the titre test was a standard test. The general "uses" of the trade, he said, regarded any substance such as that in issue having a titre point of 40 degrees or over as a tallow, while any such substance having a titre point of below 40 degrees would be a fat.

Charles E. Augner, called as a witness on behalf of the defendant, stated that he was a chemist in the customs laboratory located at the port of New York and had run a titre test exactly the same as that testified to by Mr. Moss on a sample of the shipment bearing the number C9983 furnished him through customs channels, and arrived at a titre point of 38.45. He corroborated the testimony given by Mr.

Moss to the effect that 40 degrees centigrade is considered to be the line of demarcation between animal fats and tallow. Questioned on cross-examination, he was unable to give any information as to the method by which the sample he examined had been drawn from the importation, and frankly admitted that in order to obtain accurate results in the titre test it was essential that a sample representative of the entire mass should be taken from each drum.

The most that can be said of the results accomplished on cross-examination is the eliciting from the witness of the statement that he was a chemist and not a sampler and that he therefore had no knowledge of how the sample he examined had been obtained.

The purpose of such cross-examination is not made clear in the record, but it is clearly summed up in the following language found in the brief of plaintiff's counsel:

> On cross-examination, however, he testified that he received the sample "from our receiving department." He did not know what portion of the shipment it represented. He did not know how the sample was drawn. He did not know whether it was taken from the top or bottom of the drums. He did not know whether it was taken from every drum. He admitted that the same titre measurement would not result from a sample drawn from the top of a drum as from the bottom of a drum (R. 13).

He also testified as follows (R. 14):

> X Q. So that if the sample that you analyzed was not representative of the entire drum it isn't an accurate sample for the purpose of determining the titre test?—A. That is right.

and counsel argues in his brief that on the record made the *prima facie* case made by the plaintiff was not rebutted by the Government.

I am at a loss to know on what actual basis counsel makes that statement, except it be that he relies on the fact that there is no affirmative proof in the record as to the detailed method by which the sample analyzed by Government witness Augner was taken. In my view there was no need for such affirmative proof. The Government employee who took the sample acted as a representative of the appraiser in so doing. The appraiser was required by law not only to appraise the merchandise but to describe it in order that the collector might determine the dutiable classification thereof. In order so to do it was necessary that he know of what the merchandise consisted, which in this case was determinable only by the test made. So far as the record shows there is nothing to justify the inference that what the appraiser did to that end was not fully and in every detail what the statute required. Certain it is that there was no attempt on the part of the plaintiff to show that the appraiser had not performed his full duty, and in the absence of proof to that end it must be assumed that he acted regularly.

We start with the presumption of law that all that was required of the appraiser as to the examination and appraisement of this merchandise was regularly performed and it cannot therefore be inferred that because there was no testimony on the part of the Government to support the regularity of the appraiser's action in taking the sample he therefore did not perform his full duty. On the contrary, there is an abundance of authority that the law presumes, in the absence of clear evidence to the contrary, that public officers have properly discharged their official duties. *Arthur v. Unkart*, 96 U. S. 118; *Coe v. Errol*, 116 id. 517; *Muser v. Magone*, 155 id. 240.

As the record stands before us, therefore, the presumption that the appraiser's representative properly took the sample tested by the Government chemist has not been rebutted. Plaintiff has shown that a competent chemist made a titre test on a representative sample of the merchandise and arrived at a result of 41.05 degrees centigrade, while the evidence offered on behalf of the defendant shows that an equally competent chemist made the same test on another representative sample and arrived at a result of 38.45 degrees centigrade. On such a record it should be held that plaintiff has not shown by a *preponderance* of competent evidence that the classification made by the collector was erroneous and that that sought by it was correct, as it was bound to do if it hoped to succeed.

The protest should therefore be overruled and the decision of the collector affirmed. Judgment should issue accordingly.