No. 57920.—H. A. Wood v. United States, protest 176678–K (Pembina).

Mollison, Judge: The merchandise the subject of this protest is described on the invoices as "inedible tallow" and was assessed with duty by the collector at the rate of 10 per centum ad valorem under the provision in paragraph 52, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, for "Animal * * * oils, fats, and greases, not specially provided for: Inedible * * *." A further assessment of tax or duty at the rate of 2⁷⁄₁₀ cents per pound was imposed upon the merchandise by the collector under the provision in section 2491 (a) of the Internal Revenue Code, as modified by the said general agreement for—

Inedible animal oils, inedible animal fats, and inedible animal greases * * * of a class or kind provided for in the provision of paragraph 52, Tariff Act of 1930, for all other animal * * * oils, fats, and greases, not specially provided for * * *.

It is the contention of the plaintiff that the involved merchandise is an inedible animal fat which is specially provided for in both the Tariff Act of 1930 and the Internal Revenue Code under the designation "inedible tallow" and, consequently, is not classifiable under the provisions of those laws under which duty assessments were made. The claim specifically is for duty at the rate of ¼ cent per pound under paragraph 701 of the Tariff Act of 1930, as modified by the said General Agreement on Tariffs and Trade, plus 1½ cents per pound under section 2491 (a) of the Internal Revenue Code, as so modified.

There is clearly no question that the merchandise at bar is inedible or that it is from animal sources—so far as these facts are inherent in the classification of the collector, it is not challenged by the plaintiff, who likewise offered affirmative evidence on the points. The question present simply is whether the merchandise at bar is tallow or is an oil, fat, or grease, other than tallow.

The evidence offered by the plaintiff in support of his contention is in the form of oral testimony given by two witnesses. The first of these was a partner of the ultimate consignee of the merchandise at bar, a firm dealing in hides, fur, wool, tallow, and metal. His experience in the purchase of tallow was of some 20

years' duration, and in the sale of that commodity of some 10 years, the quantities involved being of 7 or 8 carloads of from 40,000 to 60,000 pounds each per year.

The witness's conception of what the term "tallow" embraces was given as follows:

\* \* \* tallow is—comes from rendering companies or small rendering packing plants that render off the offal of the animals. They have trucks going around picking up the scraps and bones and other fats and they run them through a steamer which takes the tallow out of all these materials and is put into either the barrels or tank cars like they have the oil cars. To me, tallow is itself a form of rendering out of fats or bones or whatever you have from offal from animals. (Tr. p. 5.)

He also stated that tallow has the consistency of lard; that there are three grades of tallow, to wit, fancy, which is a pure white tallow; No. 1, which is an average white, and No. 2, which is off-color; that he purchased the involved merchandise as No. 2 tallow and sold it under the same designation; and that, based upon his experience in the business, the involved merchandise came within the term "tallow," as he understood it in the trade.

Plaintiff's second witness was the manager of the plant of the company which purchased the involved merchandise from the importer. He stated that he had been buying tallow for 6 years, and that, based upon his experience in the trade, the merchandise here involved, which he had purchased and seen, came within the term "tallow," as he understood it in the trade.

Aside from cross-examination of the foregoing witnesses, which, in our opinion, did not alter or affect the testimony, as set forth above, in any substantial manner, defendant's case consisted of the introduction as defendant's exhibits A to F, inclusive, of the reports covering titer tests made by the U. S. Customs Laboratory of the merchandise involved in the entries before the court. These exhibits show that the titers of the imported merchandise ranged from a low of 33.05° C. to a high of 38.08° C.

It is the plaintiff's position that the record establishes that the merchandise involved herein is within the common meaning of the term "tallow" and that the trade or commercial meaning is not different from the common meaning of the term.

In support of his position, plaintiff cites the cases of *Swift & Co., a Corporation* v. *United States*, 27 C. C. P. A. (Customs) 181, C. A. D. 83, and *Same* v. *Same*, 30 C. C. P. A. (Customs) 171, C. A. D. 230, as judicial determinations that the common meaning of the term "tallow" includes both unrendered and rendered animal fat, which latter description, it is contended, fits the merchandise at bar.

A reading of those decisions and an examination of the record herein, insofar as it relates to the production and nature of the merchandise at bar, establish that the plaintiff's contention is sound. It seems clear from the authorities cited by the appellate court in the *Swift & Co.* cases that the common meaning of the term "tallow" is of broad significance and includes both unrendered and rendered animal fat, in which latter category the instant merchandise, upon the evidence here offered, is shown to be.

It is the defendant's contention, however, that judicial authorities have determined that the titer test is determinative of the question whether merchandise of the character of that at bar is animal grease or tallow and have established a line of demarcation of 40° C., holding that such substances must have a titer of 40° C. or higher to be considered tallow.

The cases cited by counsel for the defendant in support of the foregoing contention are *Louis Stern Sons, Inc.* v. *United States*, 3 Cust. Ct. 14, C. D. 192, and *Armour & Co.* v. *United States*, 5 Cust. Ct. 132, C. D. 383. Examination of the opinions rendered by the court in those cases, however, does not reveal any

judicial determination that the term "tallow," as found in the tariff act, is limited to substances having a titer of 40° C. or higher. That question was not at issue in the cases, as both parties in each case apparently adopted the theory that the titer test was determinative of the question of whether the merchandise there involved was grease or tallow. The question at issue in each case, and the question upon which judicial determination was made, was the evidentiary weight to be attached to the samples drawn from the importations by the respective parties, examination of which by the titer test had led to diverse results.

To repeat—at no point in those cases was the issue raised as to whether the meaning of the term "tallow," as used in the tariff act, was limited by the titer of the substance, and the court, consequently, did not pass upon that issue. Neither of the records in the cases cited was incorporated as part of the record in this case, and, therefore, whatever evidence was adduced therein with respect to the titer test is not available for consideration in the determination of the issue raised in this case, which turns squarely upon the common meaning of the term "tallow."

As neither party herein claimed, much less established, that the commercial meaning of the term differed from its common meaning, we are bound by the common meaning of the term, as determined by the Court of Customs and Patent Appeals in the *Swift & Co.* cases, *supra*, under which the merchandise is included as tallow.

Judgment will, therefore, issue sustaining the protest claims accordingly.